MARY A. BARNHILL,                    )
                                     )
                    Plaintiff,       )
                                     )
          v.                         )          1:22CV322
                                     )
ACCORDIUS HEALTH AT GREENSBORO,      )
LLC, and ACCORDIUS HEALTH, LLC,      )
                                     )
                    Defendants.      )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge on Defendants' Motion to Strike Plaintiff's Expert Witness (Docket Entry 31), as well as the interrelated Defendants' Motion for Summary Judgment (Docket Entry 37). For the reasons that follow, the Court should deny both of the instant Motions.

## BACKGROUND

The Complaint in this case, which Plaintiff originally filed in state court and Defendants removed to this Court based on diversity of citizenship jurisdiction (see Docket Entry 1 at 1-4), alleges a claim for "Medical Negligence" against Defendant Accordius Health at Greensboro, LLC ("AHG") (Docket Entry 5 at 24) and a claim for "Corporate Negligence" against Defendant Accordius Health, LLC ("AH" and, collectively with Defendant AHG, "Defendants") (id. at 29).[1] Plaintiff brought those claims as the "duly-qualified Administratrix of the Estate of [Decedent] Karen

_____

[1] Plaintiff also initially lodged that Corporate Negligence claim against another Defendant (see Docket Entry 5 at 29), but Plaintiff later filed a stipulation of dismissal as to that Defendant (see Docket Entry 16 at 1).

Faye Rollins Barnhill" (id. at 1), who (according to the Complaint), "[a]t the time of her death, . . . was a resident of [Defendant AHG,] a skilled nursing facility" (id. at 2), where she "suffered personal injuries and death as a result of negligent care by . . . Defendants collectively" (id.). In particular, the Medical Negligence claim asserts that:

> In providing health care to [Decedent], Defendant [AHG], and its employees and agents who were licensed healthcare providers, failed to use their best judgment in the treatment and care of [Decedent]; failed to use reasonable care and diligence in the application of their knowledge and skill to [Decedent's] care; and failed to provide health care in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time the health care was provided to [Decedent].

(Id. at 24-25; see also id. at 25-28 (listing 40 failures that caused Decedent's death).)[2] Additionally, the Complaint:

> states that the conduct on the part of servants, agents, and/or employees of Defendants acting in the course of their employment with Defendants that give rise to this Complaint, and all medical records pertaining to the alleged negligence that are available to Plaintiff after reasonable inquiry, have been reviewed by a person who is reasonably expected to testify pursuant to Rule 702 of the North Carolina Rules of Evidence and who has the opinion that the conduct on the part of the agents, servants, and/or employees of Defendants fell below the applicable standard of care and is willing to testify to such.

(Id. at 31; see also id. (referring to said person as "Plaintiff's [North Carolina] Rule [of Civil Procedure] 9(j) expert").)

---

[2] The Corporate Negligence claim alleges, inter alia, that Defendant AH "breached [its] dut[y] of care by failing to ensure that [Defendant AHG] had sufficient funds in its budget so that [it] could properly care for its residents, including [Decedent], and ensure that [its] staff were following its policies and procedures." (Docket Entry 5 at 30.)

-2-

After Defendants answered (see Docket Entries 9, 10), the parties submitted a Joint Rule 26(f) Report (Docket Entry 13), which the Court adopted (see Text Order dated May 20, 2022). As a result, (A) "[t]he date for completion of all discovery (general and expert) [wa]s **July 15, 2023** (Docket Entry 13 at 2 (emphasis in original)), (B) "[r]eports required by [Federal] Rule [of Civil Procedure] 26(a)(2)(B) and disclosures required by [Federal] Rule [of Civil Procedure] 26(a)(2)(C) [we]re due . . . [f]rom Plaintiff by **February 15, 2023**" (id. (capitalization error corrected) (emphasis in original)) and "[f]rom Defendants by **April 15, 2023**" (id. (colon omitted) (emphasis in original)), and (C) "[a]ll potentially dispositive motions shall be filed by **September 15, 2023**" (id. at 3 (emphasis in original)). The Joint Rule 26(f) Report also noted that "[d]epositions of any treating physicians and expert witnesses designated by the parties shall be arranged between the parties . . . ." (Id. at 2-3 (emphasis omitted); see also id. at 1 (noting that discovery would address "issues related to the opinions of identified experts and treating physicians, if applicable" (emphasis omitted)).)

Approximately four months into the 14-month discovery period, the Clerk (by Notice dated September 16, 2022) set the case for trial during the Court's April 2024 Master Calendar session with final pretrial filings due between March 1 and 15, 2024. (See Docket Entry 27 at 1.) Nearly eight months later, on May 4, 2023 – i.e., after the expiration of the expert report and disclosure deadlines selected by the parties and adopted by the Court and with

just over two months left in the discovery period – the parties filed a Joint Motion to Amend or Alter the Scheduling Order (Docket Entry 29), in which they made the following assertions:

1) in their Joint Rule 26(f) Report, "the [p]arties agreed to staggered expert designation deadline[s] . . . [with] Plaintiff to serve her expert reports on February 15, 2023 and Defendants to serve their expert reports on April 15, 2023" (id. at 1);

2) "this Court entered a Docket Text . . . with a discovery deadline of July 15, 2023" (id.), but "[a]bsent were deadlines for the [p]arties to designated [sic] expert witnesses" (id.; see also id. at 2 ("Per the terms of the current scheduling order, no date is contemplated for the [p]arties to designate and disclose their expert witnesses and their accompanying reports.")); and

3) "this is a medical malpractice case and requires Plaintiff to present expert proof" (id. at 2); see also id. ("Because medical issues are typically complex, expert testimony is required to establish causation in North Carolina.")).

Based on those assertions, "the [p]arties respectfully request[ed] the Court grant . . . staggered expert designation deadlines, a new discovery deadline, and a new deadline for filing dispositive motions." (Id.) Specifically, they "propose[d] the following deadlines: Plaintiff to serve her expert reports by July 3, 2023, with Defendants' expert reports due on August 3, 2023. Further, the [p]arties propose[d] a new discovery deadline of September 18, 2023 and dispositive motion deadline of October 23, 2023." (Id. (emphasis omitted).) The next day, the Court (per the

-4-

undersigned Magistrate Judge) "den[ied the parties'] Joint Motion to Amend or Alter Scheduling Order." (Text Order dated May 5, 2023.) That Text Order explained that, contrary to the parties' "contention that the Court previously failed to set deadlines for expert reports/disclosures" (id.), "by Text Order dated 05/20/2022, the Court (per the [undersigned] Magistrate Judge) 'adopted [the parties'] Joint Rule 26(f) Report,' thereby setting deadlines of 02/15/2023 and 04/15/2023, respectively, for Plaintiff and Defendants to serve their expert reports/disclosures (as reflected in Paragraph 2.d. of [the parties'] Joint Rule 26(f) Report)" (id. (internal brackets omitted) (quoting Text Order dated May 20, 2022 and referring to Docket Entry 13 at 2); see also id. ("The fact that separate Docket Text . . . did not include those dates does not alter the plain language of the Text Order dated 05/20/2022, which adopted the deadlines proposed by the parties for service of expert reports/disclosures.")). As a final matter, the Text Order denying the Joint Motion to Amend or Alter Scheduling Order observed that the Clerk "ha[d] now set a trial date and extending the discovery and dispositive motions deadlines as proposed . . . would not leave sufficient time for the Court to resolve summary judgment motions in advance of the final pretrial filing dates set in [the Clerk's] Notice [establishing the trial date]." (Id. (referring to Docket Entry 27).)

On July 20, 2023, i.e., five days after the close of discovery (and more than five months after Plaintiff's expert report/ disclosure deadline), Plaintiff filed (and apparently first served

Defendants) with two expert reports and related materials. (See Docket Entry 30 at 1-17 (expert report from and related materials regarding Nurse Practitioner Kathleen A. Hill-O'Neill), 18-46 (same as to Medical Doctor James G. Lowe); see also Docket Entry 31 at 2 ("[O]n July 20, 2023, Plaintiff untimely served her Designation of Expert Witnesses and corresponding expert reports upon counsel for Defendants. Therein, Plaintiff disclosed [Nurse Practitioner] Hill-O'Neill . . . and [Medical Doctor] Lowe . . . as expert witnesses, along with their corresponding reports.").) On August 8, 2023, Defendants filed their instant Motion to Strike (Docket Entry 31; see also Docket Entry 32 (supporting memorandum)), asking "[t]he Court [to] strike Plaintiff's untimely expert reports" (Docket Entry 31 at 2; see also id. at 3 ("The Court should preclude [Nurse Practitioner] Hill-O'Neill and [Medical Doctor] Lowe from testifying as expert witnesses because their designations and written reports were untimely pursuant to the Joint Rule 26(f) Report.")). Plaintiff responded in opposition (see Docket Entry 34) and Defendants replied (see Docket Entry 36).

Defendants thereafter filed the instant Motion for Summary Judgment (Docket Entry 37; see also Docket Entry 38 (supporting memorandum)), which they "based on Plaintiff's untimely designation of expert witnesses, and Plaintiff's inability to present a prima facie case in support of her claims" (Docket Entry 38 at 3; see also id. at 7 ("Plaintiff's failure to timely designate expert witnesses leaves her with no expert testimony establishing the standard of care, that a breach occurred, and causation evidence.

-6-

Therefore, Defendants are entitled to summary judgment as a matter of law.")).  Again, Plaintiff responded in opposition (see Docket Entry 39) and Defendants replied (see Docket Entry 40).

DISCUSSION

For three decades, Federal Rule of Civil Procedure 26(a) has provided for a three-tier disclosure process (separate from the party-initiated discovery process), which:

> requires all parties (1) early in the case to exchange information regarding potential witnesses, documentary evidence, damages, and insurance, (2) at an appropriate time during the discovery period to identify expert witnesses and provide a detailed written statement of the testimony that may be offered at trial through specially retained experts, and (3) as the trial date approaches to identify the particular evidence that may be offered at trial.

Fed. R. Civ. P. 26 advisory committee's note, 1993 amend., subdiv. (a).  The middle tier, the "Disclosure of Expert Testimony," falls under Federal Rule of Civil Procedure 26(a)(2), which mandates that, "[i]n addition to the disclosures required by [Federal] Rule [of Civil Procedure] 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2)(A).  "Unless otherwise stipulated or ordered by the [C]ourt, th[at] disclosure must be accompanied by a written report — prepared and signed by the witness — if the witness is one retained or specially employed to provide expert testimony in the case . . . ."  Fed. R. Civ. P. 26(a)(2)(B).  "A party must make these disclosures at the times and in the sequence that the [C]ourt orders."  Fed. R. Civ. P. 26(a)(2)(D).

-7-

In this case (as detailed in the Background section), "[r]eports required by [Federal] Rule [of Civik Procedure] 26(a)(2)(B) . . . were due . . . [f]rom Plaintiff by February 15, 2023" (Docket Entry 13 at 2 (emphasis omitted)). (<u>See</u> Text Order dated May 20, 2022 (adopting Docket Entry 13).) As Plaintiff has conceded, "[t]here is no doubt that [she] missed [her] deadline[] to designate [her] experts." (Docket Entry 34 at 3.) "On motion or on its own, the [C]ourt may issue any just orders, including those authorized by [Federal] Rule [of Civil Procedure] 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1); <u>see also</u> Fed. R. Civ. P. 16(f)(2) ("Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of any noncompliance with [Federal Rule of Civil Procedure 16], unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust."). Coordinately, "[i]f a party fails to provide information or identify a witness as required by [Federal] Rule [of Civil Procedure] 26(a) . . ., the party is not allowed to use that information or witness to supply evidence on a motion . . . or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); <u>see also</u> <u>id.</u> ("In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard: (A) may order payment of the reasonable expenses, including attorney's fees, caused by the

-8-

failure; (B) may inform the jury of the party's failure; and (C) may impose other appropriate sanctions, including any of the orders listed in [Federal] Rule [of Civil Procedure] 37(b)(2)(A)(i)-(vi).").[3]

Although – when Defendants filed the instant Motion to Strike – Plaintiff had not yet attempted to use any expert evidence in connection with a motion or at trial, Defendants (anticipating such future use) focused the instant Motion to Strike on Federal Rule of Civil Procedure 37(c)(1)'s bar against an improperly disclosed expert's "use . . . 'on a motion . . . or at trial, unless the failure was substantially justified or harmless.'" (Docket Entry 31 at 2 (quoting Fed. R. Civ. P. 37(c)(1)); see also Docket Entry 32 at 3 (including same quotation and also quoting from discussion

---

[3] The rule provisions cross-referenced in Federal Rules of Civil Procedure 16(f)(1) and/or 37(c)(1) identify these sanctions:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

-9-

of said rule in _Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co._, 318 F.3d 592, 595-96 (4th Cir. 2003)).)  Continuing on that front, Defendants elaborated that:

> When determining whether a party's failure to timely designate an expert was "substantially justified or harmless," the [C]ourt looks to:  "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the [evidence] would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence."  It is the burden of party facing sanction to show that the untimely designation was either substantially justified or harmless.

(Docket Entry 32 at 3-4 (internal citation omitted) (first quoting Fed. R. Civ. P. 37(c)(1) and then quoting and citing _Campbell v. United States_, 470 F. App'x 151, 156 (4th Cir. 2012), which, in turn, cites, inter alia, _Southern States_, 318 F.3d at 597).)

Despite highlighting those five factors as the key to the Court's consideration of substantial justification/harmlessness under Federal Rule of Civil Procedure 37(c)(1), Defendants did not offer a clear analysis of those five factors in relation to the record in this case; instead, Defendants immediately turned to a discussion of "[North Carolina] Rule [of Civil Procedure] 26(f), which requires identification of medical experts within certain time periods" (id. at 4), as well as North Carolina case law addressing that state rule and North Carolina Rule of Civil Procedure 37 (see id. (quoting _Briley v. Farabow_, 348 N.C. 537, 541 (1998), and _In re Pedestrian Walkway Failure_, 173 N.C. App. 254,

264 (2005))).[4]  Then, after repeating the (uncontested) facts showing that Plaintiff did not timely disclose her expert reports (see id.), Defendants argued as follows:

> Defendants are unfairly prejudiced by such an untimely designation of expert witnesses.  This is a complicated medical malpractice lawsuit concerning the standard of care to be provided a nursing home resident, whether the standard of care was breached, and whether said breach caused and/or resulted in the death of [the D]ecedent.  In waiting over five months to designate her experts and serve their reports, and by further waiting until five days after the discovery deadline to provide said expert discovery, Defendants are left with no opportunity to depose Plaintiff's experts, no ability to designate their own experts to address the opinions of Plaintiff's expert witnesses, and no opportunity to defend themselves.  As the Fourth Circuit opined in *Campbell*, a party that fails to timely designate its expert witnesses "unfairly inhibits its opponent's ability to properly prepare." *Campbell*, 470 F. App'x at 157.
>
> Defendants' expert deadline was April 15, 2023.  Having received no timely expert designation from Plaintiff, Defendants were not on notice of an alleged breach and/or medical causation opinions to be offered against them.  Hence, the retention and disclosure of appropriate experts was not possible.  Further, based on the allegations as pled in Plaintiff's Complaint, the lack of a timely expert designation, as well as ongoing communications between counsel, it was believed Plaintiff's theory of liability had been disproven as of November 3, 2022.  As a result, Plaintiff's new theory of liability as set forth in her July 20, 2023 expert reports both surprised and unfairly prejudiced Defendants in their ability to mount a proper, timely defense.
>
> Furthermore, the Joint Rule 26(f) Report required that all discovery be completed by July 15, 2023; this deadline has now also passed.  Plaintiff has alleged medical negligence; "Because the standard of care in a

---

[4] "As a general matter, state procedural rules do not apply in federal court." Andes v. United States, No. 1:19CV5, 2020 WL 3895780, at *5 (W.D. Va. July 10, 2020) (unpublished).  Defendants did not articulate any reason why North Carolina Rules of Civil Procedure 26(f) and/or 37 (or North Carolina decisional authority interpreting those state rules) would apply in this Court in this instance.  (See Docket Entry 32 at 4.)

medical malpractice action generally involves specialized knowledge, expert testimony is necessary to establish the applicable standard of care and any corresponding breach." *Atkins v. Mortenson*, 183 N.C. App. 625, [630] (2007). Medical malpractice actions require extensive and costly discovery. This Court stated in its Text Order denying Joint Motion to Amend or Alter Scheduling Order that the Court "has now set a trial date and extending the discovery and dispositive motions deadlines . . . would not leave sufficient time for the Court to resolve summary judgment motions in advance of the final pretrial filing dates set in [the trial-date] Notice."

Plaintiff, by waiting some five months past her deadline to designate experts, and further by waiting until five days after the discovery deadline, has left Defendants with no opportunity to timely defend themselves and mount a proper defense. In order for Defendants to be afforded the opportunity to depose Plaintiff's expert witnesses, designate experts of their own, and file a dispositive motion, the current case management order would have to be amended and the trial date postponed. This Court made it abundantly clear in its Text Order [d]enying [the parties'] Joint [M]otion to Amend or Alter [the] Scheduling [O]rder that it would not be altering set deadlines. Thus, because of Plaintiff's untimely expert designations and reports, Defendants are severely prejudiced and left without any opportunity to conduct additional discovery, depose Plaintiff's expert witness, and provide adequate expert reports of their own.

(Id. at 4-6 (internal brackets and some citations omitted); see also Docket Entry 31 at 2-3 ("Defendants are unfairly prejudiced by Plaintiff's untimely expert witness designations and reports. Plaintiff's expert designation and disclosure deadline, set by the Joint Rule 26(f) Report, has now passed, as has the discovery deadline. Because of the untimely designation of expert witnesses, Defendants are now left without any opportunity to conduct additional discovery, depose Plaintiff's expert witness, and provide expert reports of their own.").)

As that block quotation reflects, Defendants made no effort to map their (somewhat disjointed) arguments in support of the instant Motion to Strike onto the Fourth Circuit's five-factor test for evaluation of substantial justification/harmlessness under Federal Rule of Civil Procedure 37(c)(1). (See Docket Entry 32 at 4-6.) "A party should not expect a court to do the work that it elected not to do," Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.), but the undersigned Magistrate Judge nonetheless has distilled from the above-quoted paragraphs these contentions:

1) the factors of "surprise to [Defendants]," Southern States, 318 F.3d at 597, and "ability of [Defendants] to cure the surprise," id., weigh against a finding of substantial justification/harmlessness, because (A) Plaintiff delayed for "five months [past her deadline] to designate her experts and serve their reports, and . . . five days after the discovery deadline to provide said expert discovery" (Docket Entry 32 at 5), which "left [Defendants] with no opportunity to depose Plaintiff's experts[ and] no ability to designate their own experts to address the opinions of Plaintiff's expert[s]" (id.), and (B) "[Defendants] believed Plaintiff's [original] theory of liability had been disproven as of November 3, 2022" (id.), but "Plaintiff[ presented a] new theory of liability . . . in her July 20, 2023 expert reports [which] surprised and unfairly prejudiced Defendants in their ability to mount a proper, timely defense" (id.)); and

-13-

2) the factor of "disrupt[ing] the trial," <u>Southern States</u>, 318 F.3d at 597, weighs against a finding of substantial justification/harmlessness, because "to [] afford[ Defendants] the opportunity to depose Plaintiff's expert witnesses, designate experts of their own, and file a dispositive motion, the current case management order would have to be amended and the trial date postponed" (Docket Entry 32 at 6).[5]

In response to the instant Motion to Strike, Plaintiff acknowledged the (five) <u>Southern States</u> factors and their "use[] by Defendants in their [supporting m]emorandum" (Docket Entry 34 at 4 n.2), but structured her argument around the analysis in <u>Akeva L.L.C. v. Mizuno Corp.</u>, 212 F.R.D. 306 (M.D.N.C. 2002) (Eliason,

---

[5] In addition, Defendants' argument that "Plaintiff has alleged medical negligence [and] . . . expert testimony is necessary to establish the applicable standard of care and any corresponding breach" (Docket Entry 32 at 5) appears to bear on the (fourth) factor concerning "the importance of the evidence," <u>Southern States</u>, 318 F.3d at 597; however, the criticality of the expert evidence at issue to the survival of Plaintiff's claims could (at least in the eyes of some judges) undermine Defendants' request that the Court exclude that expert evidence for summary judgment purposes and at trial, <u>see, e.g.</u>, <u>Mayor & City Council of Baltimore v. Unisys Corp.</u>, No. 12CV614, 2013 WL 4784118, at *5 (D. Md. Sept. 5, 2013) (unpublished) (declining to exclude late disclosed expert evidence, after observing that, "considering the importance of the evidence as required by the fourth [<u>Southern States</u>] factor, a wholesale exclusion of the [plaintiff's] only damages expert would utterly hamstring the [plaintiff's] ability to prove its case"); <u>but see, e.g.</u>, <u>Finch v. BASF Catalysts LLC</u>, No. 1:16CV1077, 2018 WL 2770140, at *3 (M.D.N.C. June 8, 2018) (unpublished) (Eagles, J.) ("[T]he more important the evidence, the less justification there has for failure to disclose it and the more prejudiced [the defendant] would be if the evidence were allowed."). At a minimum, "this factor must be viewed from the perspective of both parties," <u>Southern States</u>, 318 F.3d at 598 (internal quotation marks omitted), but Defendants did not develop any meaningful argument about how the Court should view this factor from either side's perspective (<u>see</u> Docket Entry 32 at 5) and "[i]t is not the Court's responsibility . . . to craft arguments for a party," <u>Allen v. BMW Mfg., Co., LLC</u>, Civ. No. 7:05-2450, 2006 WL 4451894, at *5 (D.S.C. Nov. 7, 2006) (unpublished), <u>recommendation adopted</u>, 2007 WL 1032082 (D.S.C. Mar. 30, 2007) (unpublished), <u>aff'd</u>, 260 F. App'x 623 (4th Cir. 2008).

-14-

M.J.) (see Docket Entry 34 at 4-11). In that decision, now-retired Magistrate Judge Russell A. Eliason expressly considered "what rule to apply in evaluating whether [the] plaintiff's expert report filings were untimely and what sanctions to impose." Akeva, 212 F.R.D. at 309. There, as here, "[the d]efendants request[ed] sanctions under Fed. R. Civ. P. 37(c)," id., but "there was an initial pretrial conference scheduling plan and order . . . which governed and controlled disclosures," id. In such circumstances, i.e., "[w]hen a dispute arises concerning violation of expert disclosure obligations pursuant to a court approved discovery plan, [Magistrate Judge Eliason concluded that] the Court should first look to [Federal] Rule [of Civil Procedure] 16(f) for determining . . . sanctions, as opposed to [Federal] Rule [of Civil Procedure] 37(c)." Id. As he explained, that approach makes sense because the former provision "specifically speaks to non-compliance with a scheduling or pretrial order," id., and applies only when litigants "[have] brought [such non-compliance] to the Court's attention by motion," id., whereas the latter provision "is self-executing and . . . come[s] into play . . . at or near trial," id.[6]

---

[6] Moreover, under Federal Rule of Civil Procedure 37(c)(1)'s plain language, unless a party actually presents untimely disclosed expert evidence to the Court, "[Federal] Rule [of Civil Procedure] 37(c)(1) [i]s unavailable," Petrone v. Werner Enters., Inc., 940 F.3d 425, 434 (8th Cir. 2019), because, "by its express terms, [Federal] Rule [of Civil Procedure] 37(c)(1) applies only when a party fails to comply with [Federal] Rule [of Civil Procedure] 26(a) and then seeks to use the information 'on a motion, at a hearing, or at a trial,'" id. at 435 (emphasis added) (quoting Fed. R. Civ. P. 37(c)(1)).

-15-

Magistrate Judge Eliason subsequently surveyed the case law on sanctions under Federal Rule of Civil Procedure 16(f) and deduced therefrom these <u>seven</u> pertinent factors:

1) "the explanation for the failure to obey the [scheduling] order," <u>id.</u> at 311;

2) "the importance of the expert opinion," <u>id.</u>;

3) "the prejudice to the opposing party by allowing the [untimely expert] disclosures," <u>id.</u>;

4) "the availability of alternative or lesser sanctions," <u>id.</u>;

5) "the interest in expeditious resolution of litigation," <u>id.</u>;

6) "[the C]ourt's need to manage its docket," <u>id.</u>; and

7) "[the] public policy favoring disposition of cases on the merits," <u>id.</u>

The first six of the <u>Akeva</u> factors effectively match the five <u>Southern States</u> factors, i.e., (A) factor five under <u>Southern States</u> and factor one under <u>Akeva</u> both address the tardy party's "explanation" for the delayed disclosure, <u>compare</u> <u>Southern States</u>, 318 F.3d at 597, <u>with</u> <u>Akeva</u>, 212 F.R.D. at 311, (B) factor four under <u>Southern States</u> and factor two under <u>Akeva</u> both address the belatedly disclosed expert evidence's "importance," <u>compare</u> <u>Southern States</u>, 318 F.3d at 597, <u>with</u> <u>Akeva</u>, 212 F.R.D. at 311, (C) factors one and two under <u>Southern States</u> together address "the surprise to the party against whom the evidence would be offered[ and] the ability of that party to cure the surprise," <u>Southern States</u>, 318 F.3d at 597, while factors three and four under <u>Akeva</u>

-16-

together address the same basic issues of "the prejudice to the opposing party . . . [and] the availability of [redress for that prejudice via] alternative or lesser sanctions," Akeva, 212 F.R.D. at 311, and (D) factor three under Southern States addresses "the extent to which allowing the evidence would disrupt the trial," Southern States, 318 F.3d at 597, while factors five and six under Akeva similarly address the "the interest in expeditious resolution of litigation[ and the C]ourt's need to manage its docket," Akeva, 212 F.R.D. at 311.  Thus, only Akeva's consideration (in factor seven) of the "public policy favoring disposition of cases on the merits," id., facially distinguishes it from the Southern States rubric and other Fourth Circuit authority, see, e.g., United States v. Moradi, 673 F.2d 725, 727 (4th Cir. 1982) ("[T]he clear policy of the [Federal] Rules [of Civil Procedure] is to encourage dispositions of claims on their merits . . . ."), supports acknowledgment of that public policy in connection with the assessment of Southern States's (fourth) factor, which examines "the importance of the evidence," Southern States, 318 F.3d at 597, see, e.g., Lightfoot v. Georgia-Pacific Wood Prods., LLC, No. 7:16CV244, 2018 WL 4517616, at *8 (E.D.N.C. Sept. 20, 2018) (unpublished) ("Regarding the fourth Southern States factor, the [untimely] expert declarations in substance are important . . . . Striking the [untimely] expert declarations at this juncture would undermine full and fair determination of the merits of the issues presented by this case."), reconsideration granted in part on other grounds, 2018 WL 6729636 (E.D.N.C. Dec. 21, 2018) (unpublished).

Turning back to Plaintiff's arguments applying the facts of this case to the <u>Akeva</u> factors (which, as just discussed, do not materially differ from the <u>Southern States</u> factors), her opposition to the instant Motion to Strike states:

1) "[a]s to the first [<u>Akeva</u>] factor, Plaintiff [concedes that she] cannot, in full candor to this Court, offer a reason for the delay[ed service of her expert disclosures], other than both parties were involved in written discovery in this litigation, and discussing the possibility of a negotiated settlement" (Docket Entry 34 at 4-5; <u>see also</u> <u>id.</u> at 5 ("The delay was not intentional . . . ."));[7]

2) "[a]s to the second factor in *Akeva*, [Plaintiff contends that] the importance of the expert opinions in this case is crucial" (<u>id.</u> at 5; <u>see also</u> <u>id.</u> at 6 ("[T]he importance of the two experts cannot be overstated.")), as (A) Nurse Practitioner Hill-O'Neill's "testimony undergirds the legal viability of Plaintiff's claims" (<u>id.</u> at 6), because Nurse Practitioner Hill-O'Neill "is the sole standard of care expert on the nursing care that should have been provided to [Decedent]" (<u>id.</u>), and (B) "[Medical Doctor] Lowe will explain to the jury the progression of [Decedent's] subdural hematoma and how, had she been transferred to an emergency department after having been found on the floor of her room, she

---

[7] To the extent Plaintiff has suggested, as an explanation for her untimely exert disclosures, that – in the "Text Order adopting the dates in the Joint Rule(f) Report" (Docket Entry 34 at 2) – "[t]he Court did not include the expert witness designation dates from the [Joint] Rule 26(f) Report" (<u>id.</u>), the record (as detailed in the Background section) conclusively refutes that suggestion.

most likely would have survived her injuries" (id.), i.e., Medical Doctor Lowe will provide required "causation testimony" (id.);

3) according to Plaintiff, "[Defendants'] foreknowledge of what the[se] experts will testify to [gives her the advantage on] the third *Akeva* factor" (id.), in that information she produced during the discovery period establishes "[t]he lack of prejudice [] Defendants will suffer [from the Court] allowing the [late] disclosures" (id. at 6-7; see also id. at 8 ("[T]here is no surprise whatever. Plaintiff could not have been more explicit about the theory of her case, even including the prospective expert opinions in responses to [i]nterrogatories . . . ."), 14-15 (reproducing interrogatory from Defendants asking Plaintiff to "identify each person whom [she] expect[ed] to call as an expert witness . . . and opinions to which the expert [wa]s expected to testify," along with Plaintiff's response, which mentioned (A) Nurse Practitioner Hill-O'Neill's "expected [] testi[mony as] to the breaches in the standard of care by the staff in [Defendant AHG's facility] by their failure to properly assess and treat [Decedent] after her documented fall and head injury," including particularly "fail[ure] to assess [Decedent] for risk of falls and risk of injury from falls; fail[ure] to properly care plan for [her] risk of falls; fail[ure] to properly perform neurological checks post-fall; and fail[ure] to send [her] to an emergency department immediately after her fall, given her prior head trauma and brain bleeding and her administration of a blood thinner," and Nurse Practitioner Hill-O'Neill's "expected [] testi[mony as] to

-19-

the negative effects of understaffing on resident care," and (B) a
doctor of osteopathic medicine's "expected [] testi[mony as] to the
potentially catastrophic consequences of allowing [Decedent] to
fall," including due to "administration of blood thinners," as well
as his "expected [] testi[mony] that . . . allowing her to fall in
her room led to her death," "that[,] had [she] been sent to an
emergency department immediately following her fall, the effects of
the [blood thinners] could have been reversed, and her subdural
hematoma likely successfully treated," and "that [her] death was
caused by th[at] subdural hematoma"));[8]

_____

[8] In opposing the instant Motion to Strike, Plaintiff also countered
Defendants' "argu[ment] that Plaintiff's original theory of the case was
disproven by the production of purported neurochecks completed by the staff"
(Docket Entry 34 at 2 n.1), by maintaining that "the existence of neurochecks
d[id] not negate the need to discharge [Decedent] emergently to the hospital upon
finding her on the floor" (id.), and that "Plaintiff's theory of the case ha[d]
not changed" (id.; see also id. at 8 ("Defendants argue that they are facing new
theories of liability and standard of care violations, but that is not the case.
Plaintiff's theory of the case has been, from the outset of the litigation the
same: [Decedent's] use of blood-thinners made her a high risk for injury and
death from a brain injury caused by a fall, and upon finding her on the floor of
her room, staff should have acted immediately, instead of allowing her to lie in
her bed, untreated, for several hours. The failure to act caused her death from
a massive subdural hematoma."), 9 ("[I]n correspondence, Plaintiff has been
forthcoming and consistent in her theory of the case . . . ."), 16-18 (stating,
in letter from Plaintiff's counsel to Defendants' counsel dated October 11, 2022,
that (A) "[Decedent] was a high risk for falls, and a high risk for injuries from
falls, due to her history of falls and her daily use of anti-coagulants,"
(B) "[Decedent] needed to get to the toilet but was not able to get help from the
staff to get there" and, upon "attempt[ing] to get to the toilet," "[s]he fell
. . . [and] hit[] her head on the floor," (C) "[Decedent] was found on her left
side at approximately 6:30 a.m.," (D) "[a] blow to the head like [Decedent's] can
prove deadly to a person on an anticoagulant regimen, and it did prove deadly to
[her]"), (E) "the crux of the case . . . is what happened after [Decedent] was
discovered on the floor," (F) notes produced by Defendant AHG about staff contact
with Decedent that morning do not make sense and do not show required
neurological checks, (G) staff did not seek emergency assistance for Decedent
until after 11:40 a.m., and (H) "[Decedent's] brain bleed could have been
reversed had it been identified earlier," such that "death was not a foregone
(continued...)

-20-

4) "*Akeva*'s fourth factor is the availability of lesser, alternative sanctions to exclusion" (id. at 9) and Plaintiff proffers that "the Court could . . . allow Defendants the opportunity to depose Plaintiff's experts, and designate their own without disturbing the trial date" (id.), while "preclud[ing] Plaintiff from deposing Defendants' expert witnesses ahead of trial" (id.; see also id. (arguing that said remedy would "cure [any] element of surprise" from "Plaintiff's untimely reports"));

5) in Plaintiff's view, her proposed remedy also addresses the inter-connected concerns of "[t]he fifth and sixth factors from the *Akeva* decision" (id.), which emphasize "[t]he interest in expeditious resolution of litigation, and [the C]ourt's need to manage its docket" (id.), because that remedy "ensur[es] that the trial in this matter will take place as planned" (id. at 10); and

6) "[a]s to the seventh factor in *Akeva*, the importance of a merits-based disposition of cases, Plaintiff refers the Court to her arguments . . . that [s]triking [her] expert reports . . . may well end this case without consideration of the merits of the

<hr />

[8](...continued)
conclusion after her fall"), 19 (stating, in letter from Plaintiff's counsel to Defendants' counsel dated January 26, 2023, that (A) "[Defendants'] theory of the case rests, in large measure, on the hand-written neuro-checks which were in the chart [Defendants' counsel] produced in initial disclosures, but which [Defendant AHG] did not produce to [Plaintiff] in [response] to [her earlier] request for the full and complete chart for [Decedent]," (B) "[i]t is clear that those neuro-checks are not a true record of [Decedent's] condition following her fall and before her discharge to the emergency department," and (C) "[Plaintiff's] expert . . . will testify that it is impossible for [Decedent] to have been neurologically intact during the morning . . . – as reflected in the neuro-checks – and neurologically, catastrophically devastated by noon," as well as "that [her subdural hematoma] was entirely reversible, had [she] been sent to the [emergency department] when she was found on the floor, and treatment begun then")).

Complaint" (id. (internal quotation marks and ellipsis omitted)), and that "the Court should apply the Federal Rules of Civil Procedure in a manner that avoids that result, if possible" (id. (internal quotation marks omitted)).

In their reply, Defendants agreed with Plaintiff that, as to the instant Motion to Strike, "the Court [should] look[] to [Federal] Rule [of Civil Procedure] 16(f) to determine violations for not disclosing expert reports at the time required under the scheduling order, and to determine sanctions." (Docket Entry 36 at 2 (citing Akeva, 212 F.R.D. at 309).) Defendants further endorsed the Court's consideration of the seven factors singled out in Akeva "to decide [] what kind of sanction to impose, if any." (Id. (citing Akeva, 212 F.R.D. at 311).) Regarding those factors, Defendants made these arguments:

1) the first Akeva factor favors Defendants, because "Plaintiff's only explanation for failing to obey the [scheduling] order [deadline for expert disclosures] is that [her] counsel was [engaged] with written discovery and . . . settlement negotiations" (id.), but – in a case where an attorney "stopped 'preparing discovery, including the expert witness designation, under the mistaken assumption the parties had agreed to informally delay further discovery since settlement discussions had been initiated'" (id. (additional internal quotations omitted) (quoting Briley, 348 N.C. at 541)) – "[t]he North Carolina Supreme Court rejected this

excuse on grounds it constituted unexcused negligence of the attorney" (id. at 2-3 (citing Briley, 348 N.C. at 541));[9]

2) although the second Akeva factor counsels against exclusion, in that, in this "medical negligence case requiring expert testimony" (id. at 3), "[o]bviously, the untimely reports offered by Plaintiff's experts are important" (id.), "when the other factors weigh against the dilatory designation, . . . [a] court does not abuse its discretion in excluding the expert witnesses" (id. (citing Campbell, 470 F. App'x at 157));

3) "[i]n terms of prejudice[, i.e., Akeva factor three], Plaintiff's out-of-time expert designation placed Defendants in the position of being unable to depose Plaintiff's experts, designate their own experts, or mount a proper defense" (id.; see also id. (citing Nguyen v. Jones, No. 1:19CV337, 2020 WL 7264465, at *2 (W.D.N.C. Dec. 10, 2020) (unpublished), for proposition that "[t]o allow [] Plaintiff to designate experts at this late date . . . would deprive [] Defendants of the opportunity to designate their own witnesses in rebuttal to the newly designated experts"));[10]

_____

[9] The portion of the decision Defendants quoted and cited actually recounts what "the [state trial] court held," Briley, 348 N.C. at 541, not a ruling by the North Carolina Supreme Court, although the latter court ultimately did conclude that the state trial court committed no abuse of discretion, see id. at 547. Nor do Defendants illuminate how that state court ruling (made in the context of a motion for post-judgment relief under North Carolina Rule of Civil Procedure 60(b)(1), see id.) translates to the inquiry this Court must make under Federal Rules of Civil Procedure 16(f) and/or 37(c)(1). (See Docket Entry 36 at 2-3.)

[10] The decision cited by Defendants on this point addresses the existence of "good cause" under Federal Rule of Civil Procedure 16(b)(4) to belatedly extend a plaintiff's expert disclosure deadline under a scheduling order, see Nguyen, 2020 WL 7264465, at *2, and does not address the distinct issue of
(continued...)

-23-

4) "[a]s for [<u>Akeva</u>'s fourth factor of] the availability of alternative or lesser sanctions" (<u>id.</u>), because Plaintiff served her expert reports not just after that deadline, but also after the discovery deadline, remedying the prejudice to Defendants would "necessitat[e] the entry of a new scheduling order and new trial setting" (<u>id.</u>) and such laxity as to deadlines "imposes costs on the [C]ourt and the opposing parties, both in the short and long run" (<u>id.</u> at 3-4 (citing <u>Akeva</u>, 212 F.R.D. at 311));[11] and

5) in relation to <u>Akeva</u>'s sixth factor "addressing the importance of docket control" (<u>id.</u> at 4), <u>Akeva</u> recognizes that concerns over "'docket control planning are sufficiently important to alone justify the exclusion of an untimely disclosed expert report or opinion even in absence of prejudice to the opposing party'" (<u>id.</u> (quoting <u>Akeva</u>, 212 F.R.D. at 311)).

In short order, Defendants timely filed their instant Motion for Summary Judgment (Docket Entry 37), reasoning in their memorandum in support that (A) "this is a medical malpractice case" (Docket Entry 38 at 2), (B) "[a] medical malpractice case requires Plaintiff to present expert proof" (<u>id.</u> (citing <u>Riggins v. SSC</u>

---

[10](...continued)
whether allowing a defendant another opportunity to disclose a rebuttal expert could remedy prejudice due to a plaintiff's untimely expert disclosure, <u>see</u> <u>id.</u> Defendants' prejudice arguments in reply also did not contest the portion of Plaintiff's response which rebutted their argument that her untimely expert disclosures changed her negligence theory. (<u>See</u> Docket Entry 36 at 3-4.)

[11] If remedying the prejudice to Defendants from Plaintiff's untimely expert disclosure, in fact, required a continuance of the trial, that fact also would support striking Plaintiff's improperly disclosed expert evidence under <u>Akeva</u>'s fifth factor, which considers "the interest in expeditious resolution of litigation," <u>Akeva</u>, 212 F.R.D. at 311.

-24-

_Yanceyville Operating Co., LLC_, 800 F. App'x 151, 155 (4th Cir. 2020))), (C) "Plaintiff waited over five months past the expert [disclosure] deadline to designate experts and serve the required reports" (id.), (D) "[a] party who fails to properly designate an expert witness as required by [Federal] Rule [of Civil Procedure] 26(a) may not use the expert 'on a motion, at hearing, or at trial, unless the failure was substantially justified or harmless'" (id. (quoting Fed. R. Civ. P. 37(c)(1))), and (E) "[w]ithout expert testimony establishing the standard of care and causation, Plaintiff cannot establish a genuine issue of material fact on all elements of her medical malpractice claim" (id. (citing _Warden v. United States_, 861 F. Supp. 400, 403 (E.D.N.C. 1993))).  On the question of substantial justification/harmlessness, Defendants pointed to their instant Motion to Strike (see id. at 6 (citing Docket Entry 29 and characterizing it as "setting forth the highly prejudicial effects of Plaintiff's untimely expert designation")), but did not otherwise develop any argument other than to echo a few points they pressed with the instant Motion to Strike (see id. at 6-7 (citing _Nguyen_, 2020 WL 7264465, at *2, as authority for contention that Plaintiff's "delay deprive[d] Defendants of the opportunity to depose Plaintiff's expert witnesses, designate experts of their own, or mount a proper defense," restating position (derived from _Akeva_) that failure to maintain "[s]trict adherence to discovery rules . . . imposes costs on the [C]ourt and the opposing parties, both in the short and long run," and reiterating _Akeva_'s stance on "importance of docket management")).

-25-

Plaintiff responded in opposition to the instant Motion for Summary Judgment (see Docket Entry 39), relying (as Defendants anticipated) on the expert evidence from Nurse Practitioner Hill-O'Neill to raise a material question of fact as to whether "[Defendant AHG's] staff breached the standard of care by not discharging [Decedent] to an emergency department upon finding her lying on the floor in her room, due to her use of blood-thinning medication, that made her at extremely high risk for a brain bleed" (id. at 1-2 (referring to Docket Entry 30 at 1-17); see also id. at 5 (indicating that "[Medical Doctor] Lowe will offer testimony solely on the progression of [Decedent's] subdural hematoma and its deadly consequences," i.e., "causation testimony")). Further, although Plaintiff again admitted that she failed to comply with her expert disclosure deadline (see id. at 2), she maintained, "[a]s detailed in [her m]emorandum in [o]pposition to [the instant] Motion to Strike[, that] Defendants [we]re not prejudiced by [her] failure to timely designate experts" (id. at 2-3 (citing Docket Entry 34)). In addition to "refer[ring] the Court to [that m]emorandum for her detailed arguments against striking her two expert witnesses" (id. at 3), Plaintiff emphasized:

> that Defendants have been on notice since July 2022 that [she] would rely on the expert testimony of Nurse [Practitioner] Hill-O'Neill to establish the risk of [Decedent's] death as a result of striking her head on the floor, given her use of blood-thinning medications, and that the risk was common knowledge to all licensed nurses in this state, and, therefore, failing to send [Decedent] to the hospital upon finding her on the floor was a deadly error on [] Defendants' staff's part.

-26-

(Id.)  Thereafter, "Plaintiff contend[ed] that granting of summary judgment is improper at this time, since striking her expert witnesses would be improper" (id.), insisted that "Defendant cannot point to any prejudice in both parties' failure to timely designate experts pursuant to the [] scheduling order" (id.), cited Southern States, Federal Rule of Civil Procedure 16(f), and Akeva (see id.), and reproduced (in slightly pared down form) the arguments from her response to the instant Motion to Strike (compare id. at 3-7, with Docket Entry 34 at 4-10; see also Docket Entry 39 at 7 ("Due to the availability of lesser sanctions that would put Defendants in the same position had both parties not allowed the deadline to submit expert reports [lapse], Plaintiff again respectfully requests [the instant] Motion to Strike . . . be denied.  As [the instant] Motion for Summary Judgment rests upon the presumed granting of the [instant] Motion to Strike, Plaintiff respectfully asks that the [instant] Motion [for Summary Judgment] be denied, as well.")).

As a final matter, Plaintiff alternatively argued that, "[i]n the event that [the instant] Motion to Strike . . . is granted, the [instant] Motion for Summary Judgment is still improper.  Plaintiff can properly proceed to the jury because the jury is able to use its common knowledge and experience to decide the issue[s] of negligence and causation."  (Docket Entry 39 at 7-8; see also id. at 8 ("North Carolina courts have recognized such an exception 'when the jury, based on its common knowledge and experience, can understand, evaluate, and judge the legal reasonableness of a health care provider's actions.'" (internal brackets omitted)

-27-

(quoting <u>Shumaker v. United States</u>, 714 F. Supp. 154, 159 (M.D.N.C. 1988))).) More specifically, Plaintiff asserted:

> [T]he jury's common knowledge and experience would instruct that a person taking medication to thin one's blood would lead to a deadly brain bleed if that person struck her head on the floor. This case does not involve complicated medical treatment – indeed, it is common sense to know that[,] if one is at high risk for excessive bleeding due to medication, a blow to the head could prove deadly.

> . . . Plaintiff [timely] notified Defendants that she intends to call the North Carolina Medical Director who completed [Decedent's] autopsy to testify at trial. The Medical Director will not be called as an expert witness, but as a fact witness, who is expected to testify that [Decedent's] deadly brain bleed was caused by the combination of blood-thinning medication and a blow to the head. The basic common nursing knowledge that a person on blood-thinning medication who may have suffered a head injury must be transferred to an emergency department immediately is so widely known, that Plaintiff can establish that standard through Defendants' licensed practical nurse and registered nurse employees, who will also be called adversely by Plaintiff at trial. Again, the jury can use the common knowledge and experience they possess to determine negligence, based on non-expert fact witnesses' testimony. Therefore, respectfully, summary judgment would be improper.

(<u>Id.</u> at 8-9.)

In reply, Defendants initially objected (for the first time) that, although, "[i]n her discovery responses, Plaintiff identified . . . [Nurse Practitioner] Hill-O'Neill[ as a ]standard of care witness . . . [along with a] causation witness" (Docket Entry 40 at 1), when "Plaintiff ultimately served the expert report of . . . Nurse [Practitioner Hill-]O'Neill, . . . [Plaintiff] provided no report[] for the [previously identified causation witness]" (<u>id.</u> at 2 (internal footnote omitted)), but "[i]nstead . . . produced an untimely report from a never disclosed causation witness, [Medical

-28-

Doctor] Lowe" (id.). Defendants, however, explained neither how disclosure of a different doctor to provide the same causation evidence previously forecast prejudiced them nor why they neglected to raise that objection in their filings supporting the instant Motion to Strike or their memorandum supporting the instant Motion for Summary Judgment. (See id.) "A party waives an argument by failing to present it in its opening brief or by failing to develop its argument — even if its brief takes a passing shot at the issue." Grayson O Co. v. Agadir Int'l LLC, 856 F.3d 307, 316 (4th Cir. 2017) (brackets and internal quotation marks omitted).

Next, Defendants' reply supporting the instant Motion for Summary Judgment grouses that (A) "Plaintiff's initial theory of the case centered on allegations that . . . [Defendant AHG's] nurses failed to . . . conduct[] periodic neurological checks of [ D]ecedent, that no member of [its] staff checked on or assessed [her] between 6:30 a.m. – 11:40 a.m., and that certain entries in the medical record are fraudulent" (id. (missing periods added) (citing Docket Entry 5 at 21-24)), (B) "on November 3, 2022, counsel for Defendants provided [Plaintiff] a written rebuttal" (id. (citing Docket Entry 32-1)), and (C) "Defendants never received a response . . . from Plaintiff rebutting [Defendants'] points" (id.). In fact, Plaintiff's counsel wrote to Defendants' counsel on January 26, 2023, to address the flaws with Defendants' position, i.e., their reliance "on the hand-written neuro-checks which . . . [they] produced in [their] initial disclosures, but which [they originally] did not produce to [Plaintiff] in

-29-

[response] to [her] request for the full and complete chart for [Decedent]." (Docket Entry 34 at 19; see also id. ("[I]t is clear that those neuro-checks are not a true record of [Decedent's] condition following her fall . . . . [Plaintiff's] expert . . . will testify that it is impossible for [Decedent] to have been neurologically intact during the morning of March 5, 2020 – as reflected in the neuro-checks – and neurologically, catastrophically devastated by noon. He will further testify that the [subdural hematoma] was entirely reversible, had [Decedent] been sent to the [emergency department] when she was found on the floor, and treatment begun then.").) Furthermore, Defendants effectively abandoned this line of argument by omitting it from their reply to Plaintiff's response to the instant Motion to Strike, to which she appended the above-quoted letter, in aid of her arguments that "the [purported] neurochecks d[id] not negate the need to discharge [Decedent] emergently to the hospital upon finding her on the floor" (id. at 2 n.1) and that "Plaintiff's theory of the case ha[d] not changed" (id.; see also id. at 9 ("[I]n correspondence, Plaintiff has been forthcoming and consistent in her theory of the case . . . .").  (See Docket Entry 36 at 3-4 (discussing prejudice from untimely expert disclosure without mentioning any supposed change of theory by Plaintiff).)

Lastly, Defendants addressed Plaintiff's alternative, res ipsa loquitur argument (see id. at 2-5) and repeated a handful of the contentions from their memorandum supporting the instant Motion for Summary Judgment (while also distinguishing the results reached in

-30-

<u>Akeva</u> and <u>Indura S.A. v. Engineered Controls Int'l Inc.</u>, No. 1:10CV457, 2011 WL 3862083 (M.D.N.C. Sept. 1, 2011) (unpublished), which Plaintiff had noted (<u>see</u> Docket Entry 39 at 4)) (<u>see</u> Docket Entry 40 at 5-7). Regarding res ipsa loquitur, Defendants' reply begins by pointing to "the [North Carolina] Rule [of Civil Procedure] 9(j) certification in [the C]omplaint" (<u>id.</u> at 2 (citing Docket Entry 5 at 30-31)), as an indicium that Plaintiff could not "rely[] on the common knowledge exception" (<u>id.</u> (italics omitted)). That tack leads nowhere, because "the notion that an election [of liability theories] has to be made at the time suit is filed is inconsistent with modern pleading practice." <u>Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr.</u>, 594 F.3d 285, 295 (4th Cir. 2010).[12] Defendants then pivoted to substantive North Carolina law on res ipsa loquitur, arguing that:

> The North Carolina Supreme Court has applied the common knowledge exception in a restrictive manner as recognized in the following:
>
>> The majority of medical treatment involves inherent risks which even adherence to the

_____

[12] In other words, the fact that Plaintiff pled language in the Complaint about her reliance on an expert of the sort generally required to maintain a medical malpractice claim under North Carolina law does not foreclose Plaintiff's invocation at the summary judgment stage of an exception to that general requirement. Conversely, the Complaint's inclusion of a certification that Defendants' conduct "and all medical records pertaining to the alleged negligence that [we]re available to Plaintiff . . . have been reviewed by a person who is reasonably expected to qualify to testify [as an expert] . . . [and to give an] opinion that the conduct . . . of Defendants fell below the applicable standard of care" (Docket Entry 5 at 31), undermines the argument that Plaintiff's untimely disclosure of a standard-of-care expert surprised Defendants, <u>see</u> <u>Estate of Burns by & through Vance v. Cohen</u>, No. 5:18CV888, 2019 WL 2553629, at *3 (S.D.W. Va. June 19, 2019) (unpublished) (citing presence of similar certification in the plaintiff's complaint in finding that "surprise" factor under <u>Southern States</u> "weigh[ed] heavily in [her] favor").

> appropriate standard of care cannot eliminate.
> This, coupled with the scientific and technical
> nature of medical treatment, renders the average
> juror unfit to determine whether a plaintiff's
> injury would rarely occur in the absence of
> negligence. Unless the jury is able to make such
> a determination, a plaintiff clearly is not
> entitled to the inference of negligence res ipsa
> loquitur affords.

(Docket Entry 40 at 3 (brackets and italics omitted) (block quoting
Bluitt v. Wake Forest Univ. Baptist Med. Ctr., 259 N.C. App. 1, 6
(2018), which, in turn, quotes decisional line back to Schaffner v.
Cumberland Cnty. Hosp. Sys., Inc., 77 N.C. App. 689, 692 (1985),
which, in turn, quotes and cites Mitchell v. Saunders, 219 N.C.
178, 182 (1941)).) After reproducing that quotation, Defendants
did not connect its general statement about the complexity of most
medical treatment to the facts of this case (see id.), but instead
argued that Plaintiff cannot rely on res ipsa loquitur to make out
her medical negligence claim, due to (A) Decedent's status as "a
mentally competent adult" (id.), and (B) a multiple-layers-of-
hearsay report indicating "that [she] denied hitting her head
during the fall" (id. (citing Docket Entry 40-1)).

Defendants' reply then makes these remarks, which (as best as
the undersigned Magistrate Judge can discern) attempt to substitute
sarcasm for reasoned analysis on the question of whether – even if
Plaintiff could satisfy the standard-of-care and breach elements of
her medical negligence claim via the res ipsa loquitur route – she
still would need expert evidence to prove the causation element
(i.e., to permit a reasonable jury to find that, if Defendant AHG's
nursing staff immediately had sought emergency aid upon finding

-32-

Decedent on the floor with possible head trauma, that aid likely would have prevented her death):

> Plaintiff contends that an average juror would understand that taking medication to thin one's blood would lead directly to a deadly brain bleed in the event of a fall. Presumably, an average juror would also understand the steps necessary and time required to administer the proper drugs to reverse the effects of the blood thinning medication so that surgical intervention could safely take place. Finally, it seems the average juror would appreciate the timing as to when surgery would/would not have provided any benefit to Plaintiff.

(Id. at 3-4.) That approach does not advance Defendants' cause. See, e.g., United States v. Madison, No. 6:17CR15-37, 2020 WL 7768460, at *6 (M.D. Fla. Dec. 30, 2020) (unpublished) ("[T]he [d]efense legal arguments seem to have . . . become a cathartic exercise for counsel to vent frustration by deployment of sarcasm . . . that ill serves the goal of persuasive legal argument."), aff'd, No. 21-12611, 2022 WL 4298175 (11th Cir. Sept. 19, 2022) (unpublished); Hercules v. Department of Homeland Sec., No. C07-270, 2008 WL 1925193, at *16 n.32 (N.D. Cal. Apr. 29, 2008) (unpublished) ("caution[ing] against unsupported argument which tends towards sarcasm"); BP Chems, Ltd. v. Baloun, 183 F. Supp. 2d 1158, 1159 n.1 (E.D. Mo. 2000) ("[T]he use of sarcasm . . . in th[e plaintiff's] brief does not serve the arguments made therein.").

Defendants concluded their res ipsa loquitur-related reply arguments by (A) highlighting "[the C]omplaint['s] alleg[ations that] Defendants are health care providers" (Docket Entry 40 at 4 (citing Docket Entry 5 at 24)), with "a duty to use reasonable care . . . [and] to ensure [Plaintiff's] health, safety and welfare"

(id. (citing Docket Entry 5 at 10, 30)), who "fell below the applicable standard of care" (id. (citing Docket Entry 5 at 31)), in "provid[ing] nursing and rehabilitative care" (id. (citing Docket Entry 5 at 9)), (B) relying on Littlepaige v. United States, 528 F. App'x 289, 294 (4th Cir. 2013), as "a factually similar case involving a fall with catastrophic injuries, [in which] the Fourth Circuit determined the complaint alleged medical malpractice and not ordinary negligence" (Docket Entry 40 at 4; see also id. (quoting language from Littlepaige, 528 F. App'x at 293, construing North Carolina law as recognizing that, "'when nurses make medical decisions requiring clinical judgment and intellectual skill, they are providing professional services'" and quoting Deal v. Frye Reg'l Med. Ctr., Inc., 202 N.C. App. 584 (table), 2010 WL 522727, at *4 (Feb. 16, 2010) (unpublished), for proposition that, "[w]hen making a 'Nursing Diagnosis of the patient's potential for injury from falls relating to neurological problems, the [nurses'] acts . . . require clinical judgment and intellectual skill . . . [and thus] involve[] the rendering of professional services'" (internal brackets, ellipses, emphasis, and some quotation marks omitted))), and (C) reciting part of North Carolina's statutory definition of "medical malpractice action" (id. at 4-5 (quoting N.C. Gen. Stat. § 90-21.11(2)(a))).  The reply, however, does not demonstrate why the quoted allegations from the Complaint and the cited authority preclude reliance in this case on the res ipsa loquitur exception to North Carolina law's general requirement of expert evidence in medical negligence cases.  (See id. at 4-5.)

-34-

Based on a thorough review of the record and the parties'
filings (as documented above), in light of the Akeva and Southern
States factors, the undersigned Magistrate Judge recommends that
the Court decline (A) to strike Plaintiff's untimely expert
disclosures, pursuant to Federal Rule of Civil Procedure 16(f)(1)
and/or (B) to preclude Plaintiff from relying (for summary judgment
purposes and at trial) on the expert opinions and witnesses
included in those belated disclosures, pursuant to Federal Rule of
Civil Procedure 37(c)(1). Starting with Akeva factor one/Southern
States factor five, concerning Plaintiff's "explanation," Southern
States, 318 F.3d at 597; Akeva, 212 F.R.D. at 311, Plaintiff has
conceded that "[she] cannot . . . offer a reason for the delay[ed
service of her expert disclosures], other than both parties were
involved in written discovery in this litigation, and discussing
the possibility of a negotiated settlement" (Docket Entry 34 at 4-
5). That sort of "explanation of inadvertence, mistake, and/or
neglect is not a particularly convincing explanation for why the
[expert] report[s] w[ere] not [timely] disclosed . . . ." Crimmins
v. United States, No. 2:17CV3470, 2019 WL 3766475, at *5 (D.S.C.
Aug. 9, 2019) (unpublished). This factor thus "cuts against
[Plaintiff, but] alone is not a basis to deny her the opportunity
to [use the late-disclosed expert evidence], and, [as a result],
dismiss her case in its entirety." London v. Washington Metro.

-35-

<u>Area Transit Auth.</u>, No. 8:21CV1497, 2023 WL 3727058, at *8 (D. Md. May 30, 2023) (unpublished) (emphasis added).[13]

Moving on to <u>Akeva</u> factor two/<u>Southern States</u> factor four's focus on the belatedly disclosed expert evidence's "importance," <u>Southern States</u>, 318 F.3d at 597; <u>Akeva</u>, 212 F.R.D. at 311, Defendants have acknowledged that, "obviously, the untimely reports offered by Plaintiff's experts are important" (Docket Entry 36 at 3). Indeed, the instant Motion for Summary Judgment rests on the premise that, "[w]ithout [this] expert testimony establishing the standard of care and causation, Plaintiff cannot establish a genuine issue of material fact on all elements of her medical malpractice claim, and therefore that claim must be dismissed." (Docket Entry 38 at 2.)[14] Accordingly, although "this factor must be viewed from the perspective of both parties," <u>Southern States</u>, 318 F.3d at 598 (internal quotation marks omitted), and "[i]t is not entirely clear which way this factor <u>generally</u> cuts," <u>Gilley v. C.H. Robinson Worldwide, Inc.</u>, Civ. No. 1:18-536, 2021 WL 2785333,

_____

[13] For purposes of Federal Rule of Civil Procedure 37(c)(1), this "factor – explanation for the nondisclosure – relates primarily to the substantial justification exception," <u>Southern States</u>, 318 F.3d at 597, whereas the remainder "of these factors . . . relate mainly to the harmlessness exception," <u>id.</u> Accordingly, although Plaintiff cannot qualify for the substantial justification exception to exclusion under Federal Rule of Civil Procedure 37(c)(1), she can still avoid exclusion under its harmlessness exception.

[14] As discussed previously, Plaintiff has argued that, via the res ipsa loquitur exception, her medical negligence claim could survive the exclusion of her expert witnesses; however, she also has "noted that [s]triking [her] expert reports and opinions . . . may well end this case without consideration of the merits of the Complaint[ and has urged that] the Court should apply the Federal Rules of Civil Procedure in a manner that avoids that result, if possible" (Docket Entry 39 at 7 (internal ellipses and quotation marks omitted)).

at *5 n.7 (S.D.W. Va. July 2, 2021) (unpublished) (emphasis added), in this <u>specific</u> situation, this factor – and the related <u>Akeva</u> factor seven, which recognizes the "public policy favoring disposition of cases on the merits," <u>Akeva</u>, 212 F.R.D. at 311 – tips the scale toward the conclusion that an exclusion "sanction is not [] appropriate," <u>Estate of Burns by & through Vance v. Cohen</u>, No. 5:18CV888, 2019 WL 2553629, at *3 (S.D.W. Va. June 19, 2019) (unpublished).[15]  Simply put, "the evidence is critical for [] Plaintiff's case.  If the Court were to exclude this testimony, [] Plaintiff would have no witness that could speak to [causation or] Defendant[s'] medical standard of care."  <u>Id.</u>; <u>see also</u> <u>London</u>, 2023 WL 3727058, at *8 (deeming refusal to exclude late disclosed expert evidence as "made all the more appropriate by the fact that the information is directly relevant to the case" and, "without the evidence, the jury would not have sufficient means to determine whether [the p]laintiff's complained of injuries were the result of the accident at the center of this case").

Next, for three reasons, <u>Akeva</u> factors three and four/<u>Southern States</u> factors one and two, i.e., "the prejudice to [Defendants and] . . . the availability of [redress for that prejudice via]

---

[15] Defendants have not developed any argument that the importance-of-the-evidence factor favors exclusion.  (<u>See</u> Docket Entry 32 at 5 (arguing that "expert testimony is necessary to establish the applicable standard of care and any corresponding breach" without asserting that belatedly disclosed expert evidence's significance supports exclusion); Docket Entry 36 at 3 (appearing to concede that this factor weighs against exclusion by admitting importance of this untimely expert evidence, but contending that, "when the other factors weigh against the dilatory designation, . . . [a] court does not abuse its discretion in excluding the expert witnesses"); Docket Entry 38 at 1-7 (failing to discuss this factor); Docket Entry 40 at 1-7 (same).)

-37-

alternative or lesser sanctions," <u>Akeva</u>, 212 F.R.D. at 311, and/or "the surprise to [Defendants and their] . . . ability to cure the surprise," <u>Southern States</u>, 318 F.3d at 597, also counsel against exclusion of the expert evidence at issue. First, through its inclusion of a certification under North Carolina Rule of Civil Procedure 9(j), the Complaint put Defendants on notice that Plaintiff would rely on a medical expert to establish her claim of medical negligence. (<u>See</u> Docket Entry 5 at 31.) Courts within the Fourth Circuit have treated similar state-law-mandated pleading statements as strong indicators that a plaintiff's untimely expert disclosure did not surprise the defendant. <u>See</u> <u>London</u>, 2023 WL 3727058, at *7; <u>Estate of Burns</u>, 2019 WL 2553629, at *3.[16]

Second, during the discovery period, Plaintiff responded to an interrogatory from Defendants asking her to "identify each person whom [she] expect[ed] to call as an expert . . . and opinions to which the expert [wa]s expected to testify" (Docket Entry 34 at 14), by listing (A) Nurse Practitioner Hill-O'Neill and her "expected [] testi[mony as] to the breaches in the standard of care by the staff in [Defendant AHG's facility] by their failure to properly assess and treat [Decedent] after her documented fall and head injury" (<u>id.</u> at 15), including "fail[ure] to send [her] to an emergency department immediately after her fall, given her prior head trauma and brain bleeding and her administration of a blood

---

[16] "Nor is it [otherwise] surprising that [] Plaintiff would have an expert witness to support [her] theory of the case in a medical malpractice case." <u>Estate of Burns</u>, 2019 WL 2553629, at *3.

-38-

thinner" (id.; see also id. (divulging Nurse Practitioner Hill-O'Neill's "expected [] testi[mony about] negative effects of understaffing on resident care")), and (B) a doctor of osteopathic medicine's "expected [] testi[mony as] to the potentially catastrophic consequences of allowing [Decedent] to fall" (id.), including due to "administration of blood thinners" (id.), as well as his "expected [] testi[mony] that . . . allowing her to fall in her room led to her death" (id.), "that[,] had [she] been sent to an emergency department immediately following her fall, the effects of the [blood thinners] could have been reversed, and her subdural hematoma likely successfully treated" (id.), and "that [her] death was caused by th[at] subdural hematoma" (id.). Defendants thus cannot show prejudice/surprise because, although Plaintiff "did not properly disclose [her] expert witness [reports under Federal Rule of Civil Procedure 26(a)(2)(B)] pursuant to the Court's [scheduling] order, [Defendants] w[ere] aware [Nurse Practitioner Hill-O'Neill and a causation witness] would be testifying [and what opinions they would give] through written discovery." Estate of Burns, 2019 WL 2553629, at *3.[17]

---

[17] Because Defendants failed to argue that the substitution of Medical Doctor Lowe for the originally named causation expert prejudiced them until they filed their reply in support of the instant Motion for Summary Judgment and failed even then to articulate the nature of any resulting prejudice (see Docket Entry 40 at 1-2), Defendants forfeited that argument, see Grayson O, 856 F.3d at 316. Likewise, the record refutes Defendants' inconsistently voiced view that Plaintiff's untimely expert disclosures present a different theory of the case than Plaintiff proffered before that point. (See Docket Entry 34 at 19 (explaining, in letter from Plaintiff's counsel to Defendants' counsel dated January 26, 2022, that Defendants' recent production of purported neuro-checks performed on Decedent after her fall did not alter Plaintiff's theory that
(continued...)

Third, "there is a clear opportunity to cure [any possible prejudice to Defendants] without disruption of the trial." Gilley, 2021 WL 2785333, at *5; see also id. (observing that, in that case, "[t]rial [wa]s well over two months away"). Or, as Plaintiff phrased it, "there are lesser, alternative sanctions available to the Court other than striking Plaintiff's expert reports" (Docket Entry 34 at 9), in "that the Court could allow discovery to reopen to allow Defendants the opportunity to depose Plaintiff's experts, and [could allow Defendants another chance to] designate their own [experts] without disturbing the trial date in April 2024" (id.), while imposing on Plaintiff the "lesser, alternative sanction [of] . . . preclud[ing her] from deposing Defendants' expert witnesses

---

[17](...continued)
failure of Defendants' staff to seek immediate emergency care for Decedent upon learning that she had fallen (while knowing that her use of blood-thinners placed her at grave risk of brain bleeding) breached applicable standard of care and caused her death.) In fact, as Plaintiff has contended, by the time Defendants' expert disclosure deadline arrived "in April 2023[,] . . . Defendants [c]ould have taken the wealth of information [available to them] regarding Plaintiff's theory of the case[] and . . . procur[ed] expert witnesses to counter the opinions they knew Plaintiff's experts would offer." (Docket Entry 34 at 7.) Instead, Defendants "miss[ed] their own [expert disclosure] deadline" (id.), not because of Plaintiff's failure to timely serve her expert disclosures, but rather because they too neglected to take note of the Court's adoption (via Text Order) of the expert disclosure deadlines the parties included in their Joint Rule 26(f) Report, all as confirmed by the fact that, after both sides' expert disclosure deadlines passed, Defendants "join[ed] with Plaintiff in a request to amend the [s]cheduling [o]rder" (id. (referring to Docket Entry 29 at 1-2)). Given that context, Plaintiff correctly has noted that Defendants do not stand on a particularly firm foundation from which to "complain about [her] having missed her [expert disclosure] deadline" (id.). See Gilley, 2021 WL 2785333, at *5 ("[L]itigants are expected to take necessary action to mitigate any surprise that late-disclosed evidence may cause."). With that consideration in mind, the Court should decline to require Plaintiff to reimburse Defendants for the reasonable expenses, including attorney's fees, they incurred in bringing the instant Motion to Strike because the "circumstances make [such] an award unjust," Fed. R. Civ. P. 16(f)(2), and similarly, as to the instant Motion for Summary Judgment, should not exercise its discretion to "order payment [by Plaintiff] of [Defendants'] reasonable expenses, including attorney's fees," Fed. R. Civ. P. 37(c)(1)(A).

-40-

ahead of trial" (id.; see also id. ("Such a sanction would ensure that Plaintiff does not benefit from her error, allow Defendants the discovery they need, and not disturb the trial date . . . .")). Other courts in the Fourth Circuit have endorsed similar approaches in similar situations. See, e.g., London, 2023 WL 3727058, at *7 (concluding that, "to the extent that [the p]laintiff's reliance on [late disclosed expert] would cause surprise to [the d]efendant, any such surprise could be addressed through a brief [reopening] of the discovery period," for purpose of the plaintiff "mak[ing said expert] available for deposition within thirty days").[18]

_____

[18] The Court additionally can direct Plaintiff to pay any extra marginal cost Defendants incur because they must obtain their expert reports in an expedited fashion due to the trial date, but Defendants should shoulder the standard-rate portion of any fees for obtaining their expert reports, as they would have incurred that expense even if Plaintiff had complied with her expert disclosure deadline. See Fed. R. Civ. P. 16(f)(2) (providing for shifting of "reasonable expenses . . . incurred because of any noncompliance with [mandate to obey scheduling order], unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust"). As a final matter, "[t]he [C]ourt [should] acknowledge but find[] insufficient [any] claimed prejudice that [Plaintiff's] late disclosure [of her expert reports] interfered with [D]efendants' ability to seek summary judgment." Gilley, 2021 WL 2785333, at *5 n.8. Defendants chose to file the instant Motion for Summary Judgment without including any argument that they could secure judgment as a matter of law even if Plaintiff could rely on her untimely disclosed expert reports. (See Docket Entry 38 at 1-7; Docket Entry 40 at 1-7.) Under these circumstances, "[Defendants] ha[ve] not demonstrated adequate diligence to justify granting [them] a second bite at the summary judgment apple." Norris v. PNC Bank, N.A., Civ. No. 20-3315, 2022 WL 5054099, at *5 (D. Md. Oct. 4, 2022) (unpublished). Furthermore, if depositions of Plaintiff's expert witnesses reveal previously unknown bases for seeking exclusion of their testimony, Defendants may pursue those matters via motion(s) in limine. (See Docket Entry 27 at 1 ("Motions in limine must be filed no later than March 8, 2024." (bold font omitted)).) And, if Defendants prevail on any such motion(s), the Court would retain authority, "[a]fter giving notice and a reasonable time to respond," Fed. R. Civ. P. 56(f), to "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute," Fed. R. Civ. P. 56(f)(3).

-41-

The final factors for the Court's review, Akeva factors five and six/Southern States factor three, address "the interest in expeditious resolution of litigation[ and the C]ourt's need to manage its docket," Akeva, 212 F.R.D. at 311, as well as "the extent to which allowing the evidence would disrupt the trial," Southern States, 318 F.3d at 597. As just noted, the steps needed to alleviate any prejudice to Defendants from Plaintiff's belated disclosure of her expert reports would not require a continuance of the trial. Allowing Plaintiff to rely on the opinions of those experts therefore neither would compromise "the interest in expeditious resolution of [this case]," Akeva, 212 F.R.D. at 311, nor "would disrupt the trial," Southern States, 318 F.3d at 597. On the other hand, failure to maintain "strict adherence to [expert] discovery [scheduling] rules," Akeva, 212 F.R.D. at 311, may lead some parties "[to] not pay sufficient attention in the first instance to develop[ing] expert testimony," id., which, in the "long run," id., could "impose[] costs on the [C]ourt and [other] parties," id.; see also Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc., No. 1:03CV537, 2005 WL 6043267, at *3 (M.D.N.C. July 7, 2005) (unpublished) (Dixon, M.J.) (observing that "[t]he [C]ourt's scheduling practice has proven to be effective for the management of individual cases and for overall docket control" and citing "this [C]ourt's history of strict adherence to discovery schedules"); Forstmann v. Culp, 114 F.R.D. 83, 85 (M.D.N.C. 1987) (Gordon, S.J.) ("[T]he scheduling order is not a frivolous piece of paper, idly entered, which can be

-42-

cavalierly disregarded by counsel without peril." (internal quotation marks omitted)). Taking account of <u>both</u> the absence of any interference with the orderly disposition of this case at trial as scheduled <u>and</u> the threat lax enforcement of deadlines poses to broader docket control interests, the Court should treat this last grouping of <u>Akeva</u>/<u>Southern States</u> factors as at equipoise.

In sum, Plaintiff has not presented an acceptable explanation for failing to comply with her expert disclosure deadline. However, the belatedly disclosed expert evidence holds great significance to this case and, without such evidence, Plaintiff may not receive a merits-based determination of her claims, a result that — under the public policy enshrined in the Federal Rules of Civil Procedure — the Court generally should try to avoid. Further, (A) the notice Defendants did timely receive about Plaintiff's intent to rely on expert evidence (both in the Complaint and during discovery) undermines any claim of unfair surprise, and (B) sanctions short of exclusion can off-set any other prejudice to Defendants from Plaintiff's late disclosure without delaying the scheduled trial. Finally, any possible long-term negative impact on the Court's interest in managing its docket that may arise from the failure to strictly enforce scheduling order deadlines in this case does not loom so large as to require the striking of Plaintiff's expert reports and the concomitant potential for dismissal of her claims without regard to their merits. On balance, these considerations establish (A) that striking Plaintiff's untimely disclosed expert reports and opinions

-43-

would not constitute a "just order[]," Fed. R. Civ. P. 16(f), in response to her failure to comply with the expert disclosure deadline, and (B) that Plaintiff has carried her burden of showing that "the failure . . . is harmless," Fed. R. Civ. P. 37(c)(1), such that she may "use that information [and those] witness[es] to supply evidence on a motion . . . or at trial," <u>id.</u>

Those conclusions also preclude the entry of summary judgment for Defendants. "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants based their instant Motion for Summary Judgment entirely on the anticipated exclusion of Plaintiff's expert evidence pursuant to Federal Rules of Civil Procedure 16(f)(1) and/or 37(c)(1). (<u>See</u> Docket Entry 38 at 1-7; Docket Entry 40 at 1-7.) With that relief denied, their quest for summary judgment likewise falls short.[19]

_____

[19] If the Court opts against striking/excluding Plaintiff's expert evidence, it need not resolve whether her claims could survive summary judgment without such evidence (under the res ipsa loquitur exception). Should the Court determine that it must answer that question, the undersigned Magistrate Judge recommends that the Court rule that, at this point, Defendants have failed to "show[] that there is no genuine dispute as to any material fact [pertaining to that exception] and [that they are] entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). In particular, the Court should note that, although "[North Carolina] courts have consistently found that res ipsa loquitur is inappropriate in the <u>usual</u> medical malpractice case, where the question of injury and the facts in evidence are <u>peculiarly</u> in the province of expert opinion," <u>Robinson v. Duke Univ. Health Sys., Inc.</u>, 229 N.C. App. 215, 225 (2013) (internal quotation marks and italics omitted), this case does not easily fit within the parameters of what one would consider a "usual medical malpractice case," <u>id.</u>, with a "question of injury and [] facts in evidence [] peculiarly in the province of expert opinion," <u>id.</u>, i.e., a case where a plaintiff chose to undergo a particular treatment which carried known risks even if administered according to
(continued...)

The record does not warrant the striking of the untimely disclosed expert reports of Nurse Practitioner Hill-O'Neill and Medical Doctor Lowe under Federal Rule of Civil Procedure 16(f)(1) or the exclusion of their opinions from the summary judgment record or at trial under Federal Rule of Civil Procedure 37(c)(1). Moreover, because Defendants have advanced no basis for summary judgment absent the exclusion of the opinions of Nurse Practitioner

---

[19](...continued)
the proper standard of care, such that only a medical expert could differentiate for a jury whether an injury accompanying that treatment occurred due to negligence or despite its absence, see id. at 225-26 ("'The precautions in applying res ipsa [loquitur] to a medical malpractice action stem from an awareness that the majority of medical treatment involves inherent risks which even adherence to the appropriate standard of care cannot eliminate. This, coupled with the scientific and technical nature of medical treatment, renders the average juror unfit to determine whether a plaintiff's injury would rarely occur in the absence of negligence.'" (internal brackets and italics omitted) (quoting Schaffner, 77 N.C. App. at 692)). To the contrary, this case largely turns on the issue of whether Defendants' staff – armed with the knowledge that Plaintiff took blood thinners – immediately should have sought emergency aid upon finding her on the floor with possible head trauma (and resultant excessive brain bleeding). Plaintiff thus did not solicit and elect for Defendants to provide certain medical treatment which carried certain risks of harm, during the course of which treatment she suffered one of those possible harms; rather, in the light most favorable to Plaintiff, the record reflects that Defendants' staff (while providing her with separate care for a separate condition) encountered Plaintiff in a situation indicating she may have suffered a head injury from a fall, but neglected to obtain immediate emergency assistance, despite knowing that she used blood thinners (and therefore faced a heightened risk of uncontrolled bleeding from any trauma). Viewing the case from that perspective and considering Defendants' failure (detailed earlier) to develop a proper argument about the necessity of expert evidence to prove that prompt emergency intervention could have counteracted the effect of Plaintiff's blood thinners and could have prevented her death), Defendants have not shown that the record forecloses, as a matter of law, the possibility that "'the common knowledge, experience and sense of laymen qualifies them to conclude that [Plaintiff's death from brain bleeding was] not likely to occur if proper care and skill [wa]s used,'" id. at 225 (internal brackets omitted) (quoting Grigg v. Lester, 102 N.C. App. 332, 335 (1991)); see also id. at 226 (rejecting "argument that res ipsa [loquitur] is inapplicable in [any] case [that] does not involve either a foreign object left in the body following surgery or an injury to an area far away from and completely unrelated to the zone of surgery" (italics omitted)).

Hill-O'Neill and/or Medical Doctor Lowe, Defendants have failed to demonstrate that "there is no genuine dispute as to any material fact and [that they are] entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

**IT IS THEREFORE RECOMMENDED** that the instant Motion to Strike (Docket Entry 31) be denied, but that the following alternative sanctions for Plaintiff's failure to comply with the expert disclosure deadline be imposed:

1) on or before February 2, 2024, Plaintiff shall make Nurse Practitioner Hill-O'Neill and Medical Doctor Lowe available for depositions on dates, at times, and at locations on which the parties mutually agree;

2) on or before February 2, 2024, Defendants may serve any expert disclosures required by Federal Rule of Civil Procedure 26(a)(2)(B) and (C); and

3) Plaintiff shall pay any premium Defendants reasonably incur to obtain any expert report(s) on an expedited basis in time for service by February 2, 2024.

**IT IS FURTHER RECOMMENDED** that the instant Motion for Summary Judgment (Docket Entry 37) be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 14, 2023

-46-